MOTION PICTURE PATENTS CO. v. LAEMMLE et al.

SAME v. IMP FILMS CO. et al.

(District Court, S. D. New York. May 4, 1914.)

In Equity. Nos. 9–82, 9–83.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—KINETOSCOPE.

  The Edison reissue patent No. 13329 (reissue of reissue No. 12,037, original No. 589,168), for a kinetoscope or motion picture camera, as to claims 1, 2, 3, and 5 was not anticipated and discloses patentable invention. Said claims also *held* infringed, and claim 4, if valid, not infringed.

2. PATENTS (§ 136*)—REISSUES—"INADVERTENCE, ACCIDENT, OR MISTAKE."

  Where a claim of a patent was adjudged invalid as functional, and there was no fraud or deceptive intention, the error was one arising from in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

advertence, accident or mistake within the meaning of Rev. St. § 4916 [U. S. Comp. St. 1901, p. 3392] authorizing a reissue in such cases.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 198½; Dec. Dig. § 136.*

For other definitions, see Words and Phrases, vol. 4, pp. 3488, 3489.]

3. PATENTS (§ 156*)—REISSUES—EFFECT OF FAILURE TO FILE DISCLAIMER.

Broadly speaking, the reissue and disclaimer sections of the patent statute, Rev. St. §§ 4916, 4917 (U. S. Comp. St. 1901, pp. 3392, 3393) have different purposes and different results, and that the owner of a patent has not filed a disclaimer as to claims held invalid within such time as to save his right to maintain a suit for infringement of other claims under section 4922 (U. S. Comp. St. 1901, p. 3396) does not necessarily debar him from the right to a reissue by which he surrenders all right to sue for prior infringements.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 228; Dec. Dig. § 156.*]

4. PATENTS (§ 328*)—VALIDITY OF REISSUE—KINETOSCOPE.

The Edison reissue patent No. 13,329 (reissue of reissue No. 12,037, original No. 589,168), for a kinetoscope, which repeats claims 1, 2, and 3 of the first reissue without change, and narrows claim 4, which was adjudged invalid as functional by a Circuit Court of Appeals four years before the application for reissue, *held* not invalid because of the failure to previously file a disclaimer as to such claim 4, nor because of laches or intervening public rights.

In Equity. Suits by the Motion Picture Patents Company against Carl Laemmle and the Independent Moving Pictures Company of America, and against the Imp Films Company and Carl Laemmle. On 'final hearing. Decrees for complainant against the corporation defendants, and dismissed as to defendant Laemmle.

See, also, 178 Fed. 104; 186 Fed. 641.

Dyer & Taylor, of New York City (J. Edgar Bull and John Robert Taylor, both of New York City, of counsel), for complainant.

Edmund Wetmore, Waldo G. Morse, and John L. Lotsch, all of New York City, for defendants.

William Houston Kenyon, of New York City, for Mutual Film Corporation, as amicus curiæ.

MAYER, District Judge. The suits are brought to restrain infringement of letters patent reissue No. 13,329 for kinetoscopes or motion picture cameras, granted December 5, 1911.

The patent is a reissue of reissue No. 12,037 dated September 30, 1902, which itself was a reissue of original patent No. 589,168 dated August 31, 1897.

The defenses are: (1) Invalidity; (2) noninfringement; and (3) unreasonable delay so as to render the reissue void. At the outset, an outline of the history of the litigation is desirable.

The original patent was passed upon by the Circuit Court of Appeals for the Second Circuit in Edison v. American Mutoscope Com-

pany, 114 Fed. 926, 52 C. C. A. 546. Of the four claims, three were in issue and were held invalid as too broad. In view of this decision in (as it is called) the "First Mutoscope Case," the patent was reissued. The three claims were limited to conform with the decision, and the fourth was repeated in the reissue without change.

This first reissue (No. 12,037) also came before the Circuit Court of Appeals for this circuit in Edison v. American Mutoscope & Biograph Company (the "Second Mutoscope Case") 151 Fed. 767, 81 C. C. A. 391. Claims 1, 2, and 3 were held valid while claim 4, then put in issue for the first time, was held invalid because it was functional. Two cameras of the defendant in that suit were involved—the Biograph and the Warwick. The court found infringement as to claims 1, 2, and 3 as to the Warwick, but not as to the Biograph. The usual interlocutory decree followed (March 25, 1907), but before the controversy went to final decree the parties settled their differences.

At the time the Second Mutoscope Case was commenced, suits based on reissue No. 12,037 were pending against: (1) Selig Polyscope Company in the United States Circuit Court for the Northern District of Illinois Eastern Division; (2) Sigmund Lubin in the United States Circuit Court for the Eastern District of Pennsylvania; and (3) American Vitagraph Company et al. in this district. After the decision in the second Mutoscope Case complainant moved for a preliminary injunction against the Selig Company. The motion was contested and decided favorably to complainant by Judge Kohlsaat on October 24, 1907.

A second suit was brought against American Vitagraph Company et al. on June 10, 1907, but proceedings were suspended in view of negotiations for a license. In April, 1907, suit was commenced against Miles Brothers, but was not contested.

In the fall of 1907, in addition to the Edison Company and the Mutoscope Company, the only manufacturers of motion pictures in the United States were the Vitagraph Company, Lubin, Selig Company, Pathe Frères, Kalem Company, and Essanay Film Manufacturing Company. By January, 1908, all of these manufacturers were operating under licenses acquiescing in the validity of reissue No. 12,037. The Mutoscope Company had discontinued using the Warwick and was using the Biograph, which the court had held did not infringe, but later on even the Mutoscope Company obtained a license under the Edison patent. In the summer of 1908, the complainant company was organized, and it purchased, among other things, the reissue No. 12,037, and in December, 1908, granted licenses to the Edison and Mutoscope Companies and to all of the manufacturers above mentioned to whom Edison had granted licenses in January, 1908. Until the summer of 1909, the complainant and its licensees conducted business without (except in one minor instance) encountering infringement. By this time, the remarkable possibilities of the business apparently attracted many, and the task of pursuing alleged infringers became necessary and difficult. To prove infringement it

was requisite, of course, to show clearly the detail of the interior mechanism of the alleged infringing cameras; and, as the infringing business consisted, not in the sale, but in the use, of cameras, it was essential that the interior mechanism should be examined either just before or just after a camera had been used in taking a motion picture. Motion pictures are taken in studios and also out of doors. Great care was taken by alleged infringers to prevent access to studios by strangers, and in outdoor work, bystanders were kept at a distance, and in brief the most thorough precautions were exercised to prevent inspection or discovery of the interior mechanism. The record amply sustains the assertions of complainant as to its tribulations in obtaining the necessary proof upon which to proceed in the courts, and then in following up the fly-by-night disappearances of some of the alleged infringers.[1]

Between July, 1907, and May, 1911, about 30 suits were brought, in many of which motions for preliminary injunctions were granted.

On December 11, 1909, a suit was brought in this court against the Independent Moving Pictures Company of America, one of the defendant corporations in the case at bar, and Carl Laemmle, the individual defendant herein. A motion for preliminary injunction arising out of the use by the company of a Warwick type camera was argued before Judge Noyes. The principal defense consisted of the contention that the complainant did not have the title to the patent because, as was alleged, it acquired the patent in pursuance of a contract in violation of the Sherman Anti-Trust Law. Judge Noyes overruled this defense and granted the injunction against the company. Motion Picture Patents Co. v. Carl Laemmle et al. (C. C.) 178 Fed. 104. Subsequently a motion to punish the Independent Moving Pictures Company of America and two of its officers for contempt, arising out of a violation of the injunction because of continued use of the Warwick type of camera against which the injunction had been issued, was argued before Judge Lacombe, and he found the company guilty of contempt. 186 Fed. 641. Motions for preliminary injunction under reissue No. 12,037 were brought in November, 1910, against William Steiner and others, trading under the name of Atlas Film Company, and against a corporation conducted by the same individuals and known as the Yankee Film Company. Before these motions were argued the defendants interposed demurrers, on or about November 25, 1910, to the bill on various grounds. One ground was that reissue No. 12,037 was void under section 4922 of the Revised Statutes (U. S. Comp. St. 1901, p. 3396) for unreasonable neglect and delay on the part of complainant to file a disclaimer of the fourth claim of that patent, which had been held void as functional by the Court of Appeals in the Second Mutoscope Case. This was the first time that this defense had been urged, and Judge Lacombe decided adversely to defendants and overruled the demurrers. The motions for preliminary injunction were thereupon argued, and Judge Lacombe

[1] See history of the litigations against National Cameraphone Co. et al.

granted injunctions against the defendants, referring, in his opinion, to the fact that the disclaimer defense (also presented in opposition to the motions) had already been disposed of on demurrer. The orders for preliminary injunction were thereupon made, but contained a provision excepting from the terms thereof a certain camera which had been exhibited to the court.

It is stated that slight consideration was given by the then complainant's counsel to the disclaimer defense, in view more especially of Judge Lacombe's disposition of the question on demurrer; but, on the argument on review, Judge Noyes, it is said, indicated that complainant's counsel had not treated the disclaimer defense as seriously as it deserved. At the request of counsel, the court was asked not to decide the disclaimer question on the record as it then stood, and on May 8, 1911, the Circuit Court of Appeals handed down a memorandum for reversal (187 Fed. 1007, 109 C. C. A. 664) as follows:

"The principal question presented upon these appeals is whether the complainant by its failure to enter a disclaimer of the claim declared invalid by this court has 'unnecessarily neglected or delayed,' and so lost its right to maintain suits for the infringement of the other claims. Were we certain that all the facts were before us we should consider it our duty to examine the question upon its merits for the purpose of determining whether the Circuit Court should be directed to dismiss the bills. But the complainant insists that it has not had full opportunity to present the facts, and, in view of this contention, we shall go no further than to say that, in our opinion, the case presented is too doubtful to warrant the issuance of preliminary injunctions."

Complainant was now confronted with a difficult problem, and, on advice of counsel, concluded to apply for another reissue; and thus on May 24, 1911 (16 days after the memorandum supra was handed down), application was made to the Patent Office for a reissue of reissue No. 12,037. The Patent Office was fully informed as to the situation, and reissue No. 13,329 here in controversy was granted on December 5, 1911.

Reissue No. 13,329 retains the first three claims of No. 12,037, and adds claims 4 and 5, which, it is contended, are narrower in scope than was original claim 4, and are drawn to conform with the decision in the Second Mutoscope Case.

After reissue No. 13,329 was granted, these suits were commenced and motions for preliminary injunctions were made in March, 1912. These motions were denied by Judge Lacombe with the following memorandum:

"The additions to the prior art do not impress. Complainant's argument as to reissue is a strong one, but in view of what was said by the Court of Appeals in the Yankee and Steiner Cases and of Maitland v. Goetz Mfg. Co., 86 Fed. 124 [29 C. C. A. 607], the application for a preliminary injunction is denied. The question is one for the Court of Appeals."

From the orders of denial no appeal was taken, and the suits are now here on final hearing.

[1] As to the prior art. The specifications and the drawings of the first and second reissues are the same. A comparison between

claim 1 of the first reissue and claims 4 and 5 of the second reissue will be readily noted:

Claim 1 of the First Reissue.

1. An apparatus for taking photographs suitable for the exhibition of objects in motion having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; feeding devices engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion,

and a shutter exposing successive portions of the film during the periods of rest, substantially as set forth.

1. An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; feeding devices engaging such intermediate section of the film and moving same across the lens of the camera at a high rate of speed and with an intermittent motion; and a shutter exposing successive portions of the film during the periods of rest, substantially as set forth.

Claims 4 and 5 of the Second Reissue.

4. An apparatus for taking photographs suitable for the exhibition of objects in motion having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens, feeding devices engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion, *said feeding devices comprising means proportioned to cause the devices to so advance the film that its periods of rest shall exceed its periods of motion;* and a shutter exposing successive portions of the film during the periods of rest, substantially as set forth.

5. An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized *perforated* tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; feeding devices *provided with teeth* engaging *the perforations of* such intermediate section of the film and moving *it* across the lens of 'the camera at a high rate of speed and with an intermittent motion; and a shutter exposing successive portions of the film during the periods of rest, substantially as set forth.

I agree with complainant that we start in this case with two propositions which were established by the decision in the Second Mutoscope Case: First, claims 1, 2, and 3 are not anticipated by anything which was before the court in the First and Second Mutoscope Cases; second, these claims are infringed by the Warwick camera before the court in the Second Mutoscope Case.

It is agreed that the summer of 1889 was the date of Edison's invention, and therefore the question is what patents or publications prior to that date are produced in this record which were not before the Circuit Court of Appeals in the Second Mutoscope Case.

Of the total of 49 patents and publications of the alleged new prior art, 25 are of dates prior to the summer of 1889. These are divided into four groups, viz.:

"(1) Those describing apparatus suitable for photographing an object in motion; (2) those describing apparatus for feeding a tape with an intermittent motion; (3) those describing flexible, sensitive films; (4) those describing mechanism for photographically recording telegraph signals on a light-sensitive surface."

Group 3 may be disregarded because no claim is made for a film as such. Group 4 may likewise be disregarded because no claim is made for a mechanism for photographically recording telegraph signals. As to group 1 there are but two patents: (a) Connon 369,165 (1887); and (b) Steffens 394.221 (1888). Neither describes mechanism anything like that in suit, nor can either accomplish the results desired and necessary for a motion picture camera.

Under group 2 much emphasis is placed on the Wheatstone (1858), Ostrogovich (1883), Siemens British (1868), and Thomas & Jenkins (1876), British patents for automatic telegraph instruments.

Taking the most favorable view for defendants, the most which can be said is that Edison found in one element of a telegraph instrument a suggestion for one element of a combination for a motion picture camera. I think that the Wheatstone and the rest do not go so far, but, if they do, it still required inventive ability to utilize the element in combination with other elements in a nonanalogous art.

But, after all, the best test is the human inquiry, Why did no one from 1858 until 1889 utilize the feeding mechanism of the Wheatstone in a motion picture camera, if its adaptability was so plain? ·

The art is one requiring a high degree of mechanical and scientific knowledge and ability; and before Edison's invention, men of more than ordinary attainments, such as Du Cos, Marey, and Le Prince, were working to solve the problem. The Wheatstone, for instance, was well known and not merely a paper buried in the files of the Patent Office; and I cannot escape the conclusion that there were enough men "skilled in the art" to grasp the value of the Wheatstone, the Ostrogovich, and the rest, if they appeared as plain and relevant then as they do now to defendants' expert.

There is much close analysis (suggested to some extent by both sides) of the opinions of the Circuit Court of Appeals in the two Mutoscope cases; but so far as the correctness of these opinions is questioned, this court cannot sit in review, for while Edison was not a pioneer, I think it is clear that he was the first to work out a practical commercial apparatus, namely, a motion picture camera comprising an intermittently-moved film and means for moving it, and that, in effect, was the decision in the Second Mutoscope Case.

Much is argued as to the feeding device of the patent being the take-up reel and not the sprocket wheels, and therefore that the "feeding device" does not engage with the "intermediate section of the film" because the take-up reel does not so engage; but, so far as this court is concerned, that subject seems to be foreclosed by the opinion of the Circuit Court of Appeals, Edison v. American Mutoscope & Biograph Co., 151 Fed. at page 771, 81 C. C. A. 391.

For the reasons outlined necessarily briefly, I may say, as did Judge

Lacombe, that "the additions to the prior art do not impress," and that the defense of noninvention has not been sustained.

As to infringement. Claim 5 is concededly narrowed to conform with the decision in the Second Mutoscope Case, and obviously was added to make assurance doubly sure. Defendants' camera clearly infringes this claim.

I am satisfied that the camera here in suit is in every material respect identical with the Warwick camera, before the court in the Second Mutoscope Case, and therefore that claims 1, 2, and 3 are infringed.

As to claim 4, it is doubtful whether the limitation as to the feeding device "comprising means proportioned to cause the devices to so advance the film that its periods of rest shall exceed its periods of motion" is a patentable feature, but I need not determine that question, for I incline to the view that in defendants' camera the period of rest and the period of motion are substantially equal. I have not forgotten the illustrative demonstration made by each counsel to support his argument on this proposition, but, as the question is close, and the burden is on complainant, I am not satisfied that the complainant has sustained its burden, and therefore conclude that claim 4 has not been infringed.

The question, however, concerning which there is the sharpest contest, is the validity of No. 13,329, the second reissue.

Defendants contend that the reissue in suit is invalid: (a) Because the alleged error of reissue 12,037 did not occur through inadvertence, accident, or mistake; (b) because the patentee unreasonably delayed and neglected to enter a disclaimer of claim 4 of reissue 12,037; (c) because of laches in applying for reissue 13,329; and (d) because intervening public rights accrued between March 5, 1907, the date of the decision in the Second Mutoscope Case, and May 24, 1911, the date of the application for reissue 13,329.

[2] (a) Considering the application for reissue 13,329 solely as to the question whether the error sought to be corrected had arisen by inadvertence, accident, or mistake in order that the patentee might be entitled to the benefits of section 4916, it seems to me that the case at bar is well within the purview of the statute. It is by no means easy to determine whether or not a claim is functional, and there was ample room for a genuine difference of opinion as to what the courts would hold in the case of a claim such as claim 4 in reissue 12,037. It is far from simple to fix on phraseology for patent specifications and claims which will successfully resist attack, and where, as here, there was no fraud or deceptive intention, and the patentee claimed more as new than he was entitled to such error was clearly due to that inadvertence, accident, or mistake in respect of which the statute was intended to afford relief. In the last reissue, the first three claims were repeated ipsissimis verbis; the fourth claim was narrowed and the fifth claim was drafted, concededly, to conform with the decision in the Second Mutoscope Case.

[3] (b) (c) and (d). Broadly speaking, the disclaimer and reissue statutes have different purposes and different results.[2]

At common law, a patent bad in part was bad in whole, and no suit could be maintained on it while in such defective condition.

Grant v. Raymond, 6 Pet. 221, 8 L. Ed. 376, recognized the right to amend a defective patent, and shortly after this decision, in 1832, the first reissue section became statute law. Section 3, Patent Act of 1832 (chapter 162, 4 Stat. 559). The section enacted the common-law right to amend a defective patent, but, in order to obtain a reissue, it was necessary that the old patent be surrendered, and thereby all of the rights of the patentee under the old patent were extinguished. Thus the public could freely use the invention up to the time the reissue was granted. Five years later the disclaimer sections were enacted. These sections did not take away from the patentee any of the rights he already had under the reissue section, but gave him valuable additional rights.

Thus, coming to the present, under the reissue and disclaimer sections, there may be one of two results according to which statute is availed of. In the case of reissue, the patentee loses all of the rights which he had prior to the reissue and he may ask for injunctive relief and damages only from a date subsequent to the reissue, while in the case of a proper disclaimer, the patentee may still obtain injunctive relief or damages for infringement prior to the date of disclaimer, or both, in regard to that part of the invention which is truly and justly his own.

[2] The reissue section reads as follows:
"Sec. 4916. Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new; if the error has arisen by inadvertence, accident or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the *surrender* of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee, or, in case of his death or of an assignment of the whole or any undivided part of the original patent, then to his executors, administrators, or assigns, *for the unexpired part of the term* of the original patent. Such surrender shall take effect upon the issue of the amended patent. The commissioner may, in his discretion, cause several patents to be issued for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a reissue for each of such reissued letters patent. The specifications and claim in every such case shall be subject to revision and restriction in the same manner as original applications are. Every patent so reissued, together with the corrected specifications, shall have the same effect and operation in law, on the trial of all actions for causes thereafter arising, as if the same had been originally filed in such corrected form; but no new matter shall be introduced into the specification, nor in case of a machine patent shall the model or drawings be amended, except each by the other; but when there is neither model or drawing, amendments may be made upon proof satisfactory to the commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specification by inadvertence, accident, or mistake, as aforesaid." (U. S. Comp. St. 1901, p. 3392.)

The disclaimer sections read as follows:
"Sec. 4917. Whenever, through inadvertence, accident or mistake, and without any fraudulent or deceptive intention, a patentee has claimed more than

It was quite natural that the valuable additional rights thus conferred by the disclaimer sections should be surrounded with substantial safeguards, and the Congress determined that the patentee should not eat his cake and have it, too. Therefore it was provided, among other things, that no patentee should be "entitled to the benefits of this section" if he "unreasonably neglected or delayed" to enter a disclaimer. "The benefits of this section" undoubtedly mean the right to "maintain a suit at law or in equity for the infringement of any part thereof" [meaning "the thing patented"] "which was bona fide his own."

There has been a good deal of discussion as to what would constitute unreasonable neglect or delay so as to deprive a patentee of the benefits of the disclaimer sections; and, when appeals in patent cases went direct to the Supreme Court, it was held that delay until the Supreme Court had finally passed on the validity of the claim was not unreasonable. O'Reilly v. Morse, 15 How. 62, 120, 14 L. Ed. 601; Seymour v. McCormick, 19 How. 96, 15 L. Ed. 557; Gage v. Herring, 107 U. S. at page 646, 2 Sup. Ct. 819, 27 L. Ed. 601.

It is urged by counsel for complainant that since the creation of the Circuit Courts of Appeal by the so-called Evarts Act (Act March 3, 1891, c. 517, 26 Stat. 826 [U. S. Comp. St. 1901, pp. 488, 547]), a delay to disclaim cannot be held unreasonable until the patentee has first exhausted every effort to reach the Supreme Court of the United States. Such efforts have not infrequently involved the litigating

that of which he was the original or first inventor or discoverer, his patent shall be *valid for all that part which is truly and justly his own,* provided the same is a material or substantial part of the thing patented; and any such patentee, his heirs or assigns, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of such parts of the thing patented as he shall not choose to claim or to hold by virtue of the patent or assignment, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, attested by one or more witnesses and recorded in the Patent Office; and it shall thereafter be considered as part of the original specification to the extent of the interest possessed by the claimant and by those claiming under him after the record thereof. But no such disclaimer shall affect any action pending at the time of its being filed, except so far as may relate to the question of unreasonable neglect or delay in filing it."

"Sec. 4922. Whenever, through inadvertence, accident or mistake, and without any willful default or intent to defraud or mislead the public, a patentee has, in his specification, claimed to be the original and first inventor or discoverer of any material or substantial part of the thing patented, of which he was not the original and first inventor or discoverer, every such patentee, his executors, administrators and assigns, whether of the whole or any sectional interest in the patent, *may maintain a suit at law or in equity, for the infringement of any part thereof, which was bona fide his own,* if it is a material and substantial part of the thing patented, and definitely distinguishable from the parts claimed without right, notwithstanding the specifications may embrace more than that of which the patentee was the first inventor or discoverer. But in every such case in which a judgment or decree shall be rendered for the plaintiff, no costs shall be recovered unless the proper disclaimer has been entered at the Patent Office before the commencement of the suit. But no patentee shall be *entitled to the benefits of this section* if he has unreasonably neglected or delayed to enter a disclaimer." (U. S. Comp. St. 1901, pp. 3393, 3396.)

of the validity of a patent in even more than two circuits, as was instanced in the Grant Tire Case, which was held invalid by the Court of Appeals for the Sixth Circuit, 116 Fed. 363, 53 C. C. A. 583, and again by the Court of Appeals for the Seventh Circuit, and later came before the Court of Appeals for the Second Circuit, which held the patent valid (Consolidated Rubber Tire. Co. v. Firestone Tire & Rubber Co., 151 Fed. 237, 80 C. C. A. 589) and finally reached the Supreme Court by certiorari, where the decision sustaining the patent was affirmed (Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527). See, also, the Tesla Motor patent, Dayton Fan & Motor Co. v. Westinghouse Elec. & Mfg. Co., 118 Fed. 562, 55 C. C. A. 390, Sixth Circuit; Westinghouse Elec. & Mfg. Co. v. Catskill & P. Co., 121 Fed. 831, 58 C. C. A. 167, Second Circuit; Westinghouse Electric & Mfg. Co. v. Stanley Instrument Co., 133 Fed. 167, 68 C. C. A. 523, First Circuit; Diamond Meter Co. v. Westinghouse Elec. & Mfg. Co., 152 Fed. 704, 81 C. C. A. 630, Seventh Circuit; the Bywater Patent, Hanifen v. E. H. Godshalk Co., 84 Fed. 649, 28 C. C. A. 507; Hanifen v. Price, 102 Fed. 509, 42 C. C. A. 484; Hanifen v. Armitage (C. C.) 117 Fed. 845.

But it is not necessary to determine whether complainant was guilty of unreasonable neglect and delay so as to deprive it of the benefit of the disclaimer sections, nor what would have been its fate had it gone to final hearing in the Yankee and Steiner Cases.

The failure to disclaim did not of itself render the patent void. It simply resulted in closing the door to recovery for past damages and injunctive relief at that time, because complainant itself closed that door when the patent was surrendered and reissue 13,329 was applied for.

It is important throughout, to keep in mind the distinction between the purposes and results of the two statutes. It will be noted that the reissue statute does not contain any admonition as to neglect or delay, but the courts have worked out and applied certain principles which seem simple enough when stated. The difficulty lies, not in an understanding of the principles, but in their application to any particular set of facts.

The books are full of cases where the courts have appreciated the importance of intervening rights, and have realized the injury which may or will be done to the public where, after either an unreasonable delay or a process of experimentation with court decisions, an attempt is made to broaden claims. In such instances, industry and commercial progress may be arrested if the courts were to hold to any doctrine which made it dangerous for energetic men to enter upon some well-defined field of activity only to discover subsequently that a grant theretofore given had been enlarged beyond the limits so defined. Thus it is that there is a line of cases of which Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783, and Thomson-Houston Electric Co. v. Western Electric Co., 158 Fed. 813, 86 C. C. A. 73, are examples. Nowhere, however, has it been held that a reissue wherein the claims are narrowed is void for laches. It is true that in Pelzer v. Meyberg, 97 Fed. 969, it was held that there were degrees of diligence in apply-

ing for a reissue, and that a higher degree was required in the case of a broadened claim than in the case of a narrowed claim. The case came up on demurrer, and apparently there no excuse for the delay was set forth.

I cannot say that I agree that the question turns upon the degree of diligence, nor is it necessary to determine whether a narrowed reissue cannot, in any event, be defeated, because of laches under circumstances which amount to estoppel. I realize that cases may arise where the facts may be analogous in principle with those in Richardson v. Osborne (C. C.) 82 Fed. 92, and where, therefore, a patentee has so conducted himself in regard to a reissue on narrowed claims as to invalidate his patent generally or as to deprive him of injunctive relief as against some particular defendant.

[4] But it is not necessary in the case at bar to announce general principles obiter; for here the facts, I think, clearly entitle the owner of the patent to reissue 13,329.

Throughout the period beginning in March, 1907, the date of the decision of the Second Mutoscope Case, and ending with the memorandum of the Court of Appeals for the Second Circuit in the Yankee and Steiner Cases, claims 1, 2, and 3 were valid. It may very well be that cameras could be used which would infringe claims 1, 2, and 3 and not infringe claim 4, but I am satisfied that there was no camera akin to the Warwick which would infringe claim 4 and not infringe claims 1, 2, and 3.

The complainant was pursuing alleged infringers practically all over the country. Instead of being idle and supine, it was engaged in activities so marked as to call for the defense in 1910 from two of the defendants in the present litigation that the complainant was itself a monopoly, or was a member of a combination in violation of the federal anti-trust statute (178 Fed. 104).

The defendants Laemmle and Independent Moving Pictures Company of America knew perfectly well what the claims of complainant were, as is evidenced by the case in 178 Fed. 104; and, indeed, all of the defendants here were sufficiently grown up to know their way about and not to be deceived nor misled by any acts of complainant so far as the litigation here is concerned. In fact, the defendant Imp Films Company is in a sense the moral, though perhaps not technically the legal, successor of the Yankee-Independent Moving Pictures Company of America, and Laemmle was apparently the dominant factor in the defendant corporations.

Unless, as matter of law, reissue 13,329 is void, there is nothing that complainant has done in relation to these defendants which entitles the defendants to claim that they have been injured, or that complainant is estopped as against them by reason of delay in applying for reissue 13,329. The truth is that defendants took their chance as to what the courts might determine in regard to the status in law of the Edison patent. They have done very well from a practical standpoint, because they are free of all claims for infringement prior to the date of the second reissue. On the other hand, the complainant, when confronted with the necessity of deciding what to do after the Yankee and

Steiner opinion of the Circuit Court of Appeals, adopted the course of least danger and least resistance.

Upon the facts in the case, I am unable to find warrant for the conclusion that the reissue is void, as matter of law. The valid claims were simply repeated, the new claims were narrowed, the infringement of the discarded claim necessarily involved the infringement of the valid claims, the business and court history was one of constant assertion of the validity of the patent and pursuit of infringers, and nowhere were there any real intervening rights.

To declare the present reissue invalid would be to deprive the owner of the patent of the fruits of an invention which the courts have declared valid in all substantial particulars and which I regard as a meritorious invention and a useful contribution to an industry that has advanced by leaps and bounds, that has given employment to many thousands of people, and that has afforded amusement and instruction to the public at large. So far as the facts in this case disclose, the intervening rights of the public in respect of which the defendants feel so deeply are synonymous only with the intervening hazards of infringers.

For the reasons indicated, I am of opinion that reissue 13,329 is valid, and that claims 1, 2, 3, and 5 are infringed.

For purposes of brevity I have referred throughout to "the defendants," but there is no evidence in this record which will charge the defendant Laemmle individually with infringement. Therefore, the bill as to him will be dismissed, and complainant may have the usual decree as to the other defendants.

I think it unnecessary to decide in detail the motions made at the opening of the final hearing. If counsel think otherwise, that may be brought up at the time of the settlement of the decree.