EDISON v. AMERICAN MUTOSCOPE & BIOGRAPH CO.

(Circuit Court of Appeals, Second Circuit. March 5, 1907.)

No. 153.

PATENTS—VALIDITY AND INFRINGEMENT—KINETOSCOPIC CAMERA.

The Edison reissued patent No. 12,037 (original No. 589,168), for a kinetographic camera, claims 1, 2, and 3, were not anticipated and disclose patentable invention in the means shown for imparting an intermittent movement to the tape film while passing in front of the lens, which consist of a sprocket wheel having teeth which enter holes in the edge of the film and advance it positively, evenly, and rapidly. Such claims *held* not infringed by a camera in which the film is moved by frictional contact alone, although such construction is within their terms if construed without reference to the words, "substantially as set forth," but infringed by one in which the film is moved by a reciprocating two tined fork carrying studs or pins which engage holes on either edge of the film, and is the substantial equivalent of the sprocket wheel of the patent. Claim 4 of said reissue *held* void as too broad.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 144 Fed. 121.

This cause comes here upon appeal from a decree of the Circuit Court, Southern District of New York, dismissing a bill in equity for infringement

of a patent. The patent is reissue No. 12,037, dated September 30, 1902, original No. 589,168 (August 31, 1897), to Thomas A. Edison for a kinetoscope. The opinion below will be found in 144 Fed. 121.

The original patent was before this court in a suit by the same complainant against the same defendant, reported 114 Fed. 926, 52 C. C. A. 546. The claims of the original patent were:

"(1) An apparatus for effecting by photography a representation suitable for reproduction of a scene including a moving object or objects, comprising a means for intermittently projecting at such rapid rate as to result in persistence of vision images of successive positions of the object or objects in motion, as observed from a fixed and single point of view, a sensitized tape-like film and a means for so moving the film as to cause the successive images to be received thereon separately and in a single line sequence.

"(2) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape film at a high rate of speed across the lens of the camera, and for exposing successive portions of the film in rapid succession, substantially as set forth.

"(3) An apparatus for taking photographs suitable for exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape-film across the lens of the camera at a high rate of speed and with an intermittent motion, and for exposing successive portions of the film during the periods of rest, substantially as set forth.

"(4) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a single camera, and means for passing a sensitized tape-film across the lens at a high rate of speed and with an intermittent motion, and for exposing successive portions of the film during the periods of rest, the periods of rest being greater than the periods of motion, substantially as set forth.

"(5) An unbroken transparent or translucent tape-like photographic film having thereon equidistant photographs of successive positions of an object in motion, all taken from the same point of view, such photographs being arranged in continuous straight-line sequence, unlimited in number save by the length of the film, substantially as described.

"(6) An unbroken transparent or translucent tape-like photographic film provided with perforated edges and having thereon equidistant photographs of successive positions of an object in motion, all taken from the same point of view, such photographs being arranged in a continuous straight-line sequence, unlimited in number save by the length of the film, substantially as described."

In the prior suit the Circuit Court sustained claims 1, 2, 3, and 5, and those only came before this court upon the appeal. It was held that the patentee was not entitled to such broad claims, the decree of the Circuit Court was reversed, and the bill dismissed. Thereupon the patentee applied for and obtained a reissue, in two patents, one for the film as a new article of manufacture (the subject of original claim 6), which is not involved in this case, and the other which is now sued upon. This reissued patent contains four claims; the first three are as follows:

"(1) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; feeding devices engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion; and a shutter exposing successive portions of the film during the periods of rest, substantially as set forth.

"(2) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; a continuously rotating driving-shaft; feeding devices operated by said shaft engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with

intermittent motion; and a continuously-rotating shutter operated by said shaft for exposing successive portions of the film during the periods of rest, substantially as set forth.

"(3) An apparatus for taking photographs suitable for the exhibition of objects in motion, having in combination a camera having a single stationary lens; a single sensitized tape-film supported on opposite sides of, and longitudinally movable with respect to, the lens, and having an intermediate section crossing the lens; a continuously rotating driving-shaft; feeding devices operated by said shaft, engaging such intermediate section of the film and moving the same across the lens of the camera at a high rate of speed and with an intermittent motion; a shutter exposing successive portions of the film during the periods of rest; and a reel revolved by said shaft with variable speed for winding the film thereon after exposure, substantially as set forth."

The fourth claim of the reissued patent is identical with the fourth claim of the original. One of the alleged infringing devices, that, namely, which, it is contended, infringes only claims 1, 2, and 3, is the same device that was before the court in the first suit and is known as the "Biograph camera." The other alleged infringing device is known as the "Warwick camera," and it is contended infringes also claim 4.

J. Edgar Bull, for appellant.
Parker W. Page, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). Upon the appeal in the first suit we discussed the prior art and the general character of the device sought to be patented at very great length. It is unnecessary to repeat that discussion. All that was said in the prior opinion, however, may be considered as embodied herein, since the conclusion hereinafter expressed is founded upon the findings then made, and which nothing in the present record or argument induces us to qualify in any manner. We held that Edison was "not a pioneer in the large sense of the term, or in the limited sense in which he would have been if he had invented the film. He was not the inventor of the film. He was not the first inventor of apparatus capable of producing suitable negatives, taken from practically a single point of view, in single-line sequence upon a film like his, and embodying the same general means of rotating drums and shutters for bringing the sensitized surface across the lens and exposing successive portions of it in rapid succession. * * * Neither was he the first inventor of apparatus capable of producing suitable negatives and embodying means for passing a sensitized surface across a single lens camera at a high rate of speed and with an intermittent motion, and for exposing successive portions of the surfaces during periods of rest." Also that "the real invention, if it involved invention as distinguished from improvement, probably consists of details of organization, by which the capacity of the reels and moving devises are augmented and adapted to carry the film of the patent rapidly and properly."

Upon the record in that cause, however, we held that the "prior art did not disclose the specific type of apparatus which is described in his patent. His apparatus is capable of using a single sensitized and flexible film of great length with a single lens camera. and of producing an indefinite number of negatives on such a film with a rapidity theretofore unknown." The case was therefore an appropriate one for re-

issue under section 4916, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3393], since there is no suggestion of any fraudulent or deceptive intention in claiming more than the patentee was found to be entitled to. Upon reissue with claims restricted to the specific type of apparatus described in the patent, the question would be presented whether those claims as thus restricted were properly allowed in view of the state of the art and whether defendant's device infringed them.

The specific type of apparatus shown in the patent was thus described in our former opinion:

"It is inclosed in a box-like casing from which light will be excluded, except through the lens, and which embraces an ordinary adjustable camera having the lens end mounted in the side of the box. Two reels, inclosed in suitable cases, are located on opposite sides of the camera lens. The film is drawn from one of the reels on to the other across the lens. It is transparent or translucent, and tape-like in form, and is preferably of sufficient width to admit the taking of pictures one inch in diameter between the rows of holes on its edges. These holes are for engagement with the feed wheels for positively advancing the film. When the film is narrow, it is not essential to use two rows of perforations and two feed wheels; one of such rows and one feed wheel being sufficient. The two feed wheels are carried by a shaft and engage the film on one side of the camera opening. The power is supplied by an electric motor which drives a rotating shaft carrying the feed wheels through a pulley held in frictional engagement with the feed-wheel shaft. The take-up reel, or the reel which receives the tape after passing the lens, is also driven from the motor shaft through a pulley which is frictionally mounted upon the reel shaft. The shaft carrying the feed wheels is controlled by a stop or escapement movement which is driven positively by another shaft, so that, although the motor tends to drive the feed wheels continuously, they are only permitted to turn with an intermittent motion by the stop or escapement device, the pulley which drives the feed wheels slipping on the feed wheel shaft, while that shaft is held at rest by the stop or escapement device. A shutter consisting of a rotating disk having an opening in it is mounted directly upon the motor shaft and revolves past the lens, so that the light from the lens is intermittently thrown upon and cut off from the sensitive surface of the film. The camera is shown as a single lens, and is arranged to project the image of the scene being photographed upon the film when the openings of the shutter disk are opposite the aperture between the lens and the film. In operation the apparatus is first charged with a tape-film several hundred or even thousands of feet in length. The specification states that the parts are preferably proportioned so that the film is at rest for nine-tenths of the time, in order to give the sensitized film as long an exposure as practicable, and is moving forward one-tenth of the time, and that the forward movement is made to take place 30 or more times per second, and preferably at least as high as 46 times per second, although the rapidity of movement or number of times per second may be regulated as desired to give satisfactory results, and there should be at least enough so that the eye of the observer cannot distinguish, or, at least, cannot clearly or positively distinguish, at a glance, the difference in position occupied by the objects in the successive pictures."

The securing of intermittent action to the parts which engage the film is effected by certain stop devices, the details of which need not be inquired into. They are equally adapted to other uses than those shown in the patent, and are the subject of a separate patent to Edison No. 491,993. The important distinctive feature is the manner in which these intermittently moving parts handle the film. In addition to the references in the earlier case, there are a number of patents introduced here, of which it is sufficient to say that we concur with the judge who heard the cause at circuit that the apparatus described in the patent ex-

hibits patentable novelty. Such novelty, however, cannot be predicated solely on the circumstance that the intermittently moving parts operate directly upon the film. The meritorious feature of the device is that they seize hold of the film firmly, move it positively, regularly, evenly, and very rapidly without jarring, jerking, or slipping producing a negative, which can be printed from and reproduced as a whole without rearrangement to correct imperfect spacing of the successive pictures. The specification states that when the film is clamped in the delivery case "the loose pulleys, 7, 18, slip without pulling said film along," and that, when the film is released from that clamp, "the pulleys operate to pull the same along." Loose pulley, 18, turns the take-up reel, and it has been suggested that the phrases quoted imply that such reel is in fact the feeding mechanism. A careful study of the patent has satisfied us that this is not so. The specification explicitly states that the "teeth of the wheels, 5, enter the holes along the edges of the film for the purpose of positively advancing the film." The organization described shows that the sprocket wheels are adapted to push the film along as they revolve, as well as to hold it back when they are at rest. The distance to be moved for each exposure is so short (an inch) that the film can apparently be moved forward by pushing as well as by pulling, since the guard or guide through which it moves protects it against buckling. While the film may at times be practically tense between the intermittently moving sprocket wheels and the take-up reel, it would seem that operation at high speed would soon produce a slack or loop between the sprocket wheels and the delivery reel; and the evidence of complainant's expert shows that in practice this is so. The specification states that, when the film is narrow, it is not essential to use two rows of perforations and two feed-wheels, but at least one sprocket wheel and one row of perforations are essential to the organization described. In succession each sprocket enters a hole thereby holding the film firmly and positively and either advancing it forward or holding it at rest by a method of engagement, which eliminates all chance of slip. The engagement between the feed wheels and the fi'm is not frictional. The film is continuously held by the interlocking of a sprocket and a hole. As one sprocket leaves a hole, the next succeeding sprocket enters the next succeeding hole. Irrespective entirely of any action of the take-up reel, the film must advance as the sprocket wheel moves, and cannot advance when the sprocket wheel is at rest. Complainant's expert has operated a camera constructed in substantial accordance with the specifications, and from which he had removed the take-up reel. He found that the sprocket wheels alone moved the intermediate section of film across the camera at the requisite hight rate of speed and with the intermittent motion.

In the defendant's biograph camera there are the usual reels and devices for giving to some parts of the apparatus a continuous and to others an intermittent motion. The "intermediate section" of film is moved across the lens by two friction rollers located just beyond the film guide. These move continuously, and draw the film forward. The mechanism for holding the same stationary during exposure is stipulated in the record. "Mounted upon the motor shaft, N, is a grooved cam n imparting movement to an arm, $n^1$ [which arm rocks a shaft, $n^2$].

* * * Loosely mounted upon the journal, $n^2$ [of the rock shaft], is a tension leaf, W, forming part of the film slide [or film guide], F. The film, B, passes between this tension leaf and the back plate, f, of the guide. * * * $n^5$ designates a projection mounted upon the rock shaft, $n^2$, and co-acting with the tension leaf, W, to throw the same away from the back plate and therefore out of engagement with the film when a portion of the film has been exposed and it is desired to again move the film relatively to the lens. The rolls, which draw the film, rotate constantly, and would feed the film past the lens with a continuous motion were it not that the film is gripped by the tension leaf momentarily to admit exposure."

Figure 5 of the drawings of defendant's biograph machine will facilitate the understanding of this description.

It will be observed that there is a part marked "$n^4$," called a "punch," which might be supposed to have, in part, the function of complainant's sprocket, holding back the film by interlocking engagement. This is not so as will be seen when the necessity for using a punch is pointed out later on.

The engagement of defendant's moving parts with the "intermediate section" of film is wholly frictional. There is no such interlocking as will hold the film firmly, advancing it with mathematical accuracy precisely the same distance between exposures, making its motion absolutely coextensive with that of the sprocket wheel from the beginning of the operation to the end, and thus securing a perfection of spacing of the negatives upon the exposed film. It is apparent that in defendant's engagement there is the possibility of "slip"; and it might be expected that the likelihood of such action would be increased by the extremely

high speed at which these machines are run, giving 20 or more expo-
sures per second. This, moreover, is not a matter of conjecture, there is
positive proof. Marvin, who has had large experience in operating de-
fendant's machines, testified:

"Negatives to my knowledge are never exhibited in public. In order to ex-
hibit a picture, it is necessary to print positive reproductions. The apparatus
in which such positive reproductions are printed can readily be arranged so
that the pictures upon the positive strip of film are uniformly spaced, although
the pictures upon the negative strip may be very unevenly spaced. As a mat-
ter of fact, none of the cameras of our company produce uniformly-spaced
negatives. In the manufacture of our mutoscope pictures the positive pictures
are printed upon bromide paper and the paper is cut up so that each piece of
paper carries an independent picture."

It is solely to facilitate this operation that the punches are brought
into the combination. The film has no holes along its edges as it leaves
the supply reel. They are punched in only at the moment of exposure.
The stipulated description reads:

"Secured to the rock shaft, $n^2$, are two punch arms, $n^3$, at the outer ends of
which are mounted punches, $n^4$. * * * The film, B, is perforated in its
passage between said tension leaf and back plate by means of the punches,
$n^4$. * * * The film is gripped by the tension leaf momentarily to permit
exposure. During this gripping interval, the punch, $n^4$, is actuated to per-
forate the film opposite each exposed portion and at or adjacent to each of the
film."

The use of the perforations as an aid to correcting the results of im-
perfect spacing is shown in the testimony of Johnson, superintendent of
defendant's photographic department:

"The feed in the biograph camera is by friction rollers, and the feed is tol-
erably regular so long as the film is of one thickness and so long as all the
adjustments on the machine are kept in first-rate condition. As a matter of
fact, however, the film varies very considerably in thickness, and the feed is
by no means regular, varying from three-sixteenths to five-sixteenths of an
inch in some cases. The normal proper feed is one-quarter of an inch. It
would not be possible to exhibit properly a positive facsimile of the negative
film which our company's [biograph] camera produces.

"Q. 21. Please explain how defendant company prepares the films and prints
from these negatives which are used in the exhibiting machines?

"A. The camera is provided with a pair of punches and dies, which are
brought into operation and perforate the film during the period of exposure.
The perforations are situated in a blank space underneath the picture proper,
and always bear a fixed relation to the picture itself, so that these holes, be-
ing fitted over dowel pins in our printing machine, enable us to print a pic-
ture which shall be perfect in register with every other picture, irrespective
of the spacing in the negative film. * * * The spacing of the pictures on
the positive film made by our company is such that the scenes which the pho-
tographs represent will not be properly produced by simply passing the film
through the biograph."

Because of these differences in parts, in action, and in result, we are
of the opinion that the defendant's biograph camera is not the type of
apparatus described and shown in the original and reissued patent.
The language, even of the reissued claims, considered by itself and giv-
ing no force to the words, "substantially as set forth," may be broad
enough to cover it; but that is not sufficient. "Infringement should not
be determined by a mere decision that the terms of a claim of a valid
patent are applicable to the defendant's device. Two things are not

precisely similar because the same words are applicable to each. The question of infringement involves considerations of practical utility and of substantial identity, and therefore must be quantitative as well as qualitative." Goodyear Shoe Mach. Co. v. Spalding (C. C.) 101 Fed. 990. We conclude, therefore, that defendant's biograph camera does not infringe claims 1, 2, or 3 of the reissue.

The other apparatus used by defendant, viz., the Warwick camera, has a different mode of operation. The engaging rollers, which advance the film after it has passed the film slide or guide where exposure is made, and which deliver it to the take-up reel, are located about half way between the take-up reel and the film slide, and their movement is so regulated as to other parts that there will always be a loop of slack film between said rollers and the film slide. In consequence the film cannot be advanced by any revolution of these rollers, as was the case with the biograph camera. The film as it comes from the delivery roll has a row of holes along each edge. When it is in the film slide, these holes are engaged by means of a reciprocating two-tined fork, carrying small studs or pins which pass into the holes on the opposite edges of the film, in the same way as the sprockets pass into the holes in complainant's machine. As these studs or pins are inserted on the down stroke of the fork, and withdrawn on the up stroke, the film is intermittently fed across the field of the lens. These pins or studs do not hold back the film against any forward pull, because there is no forward pull to be resisted, neither an intentional forward pull as found in the biograph, nor an accidental or occasional forward pull when the film is taut between the film slide and take-up roll as found in the camera of the patent. When the pins are withdrawn, the film lies, inert, in the film slide. But the "intermediate section" is moved across the lens just by the interlocking engagement between a sprocket or pin and a hole in the film, thereby moving it positively, regularly, evenly, and very rapidly without jarring, jerking, or slipping; the parts being arranged so that the movement shall be intermittent. In our opinion the bifurcated fork with studs is the fair equivalent of the wheel with sprockets and the combination shown in the Warwick camera is an infringement of claims 1, 2, and 3 of the reissued patent.

Claim 4 of the reissue is identical with claim 4 of the original and differs from claim 3 of the original only by the insertion of the words, "the periods of rest being greater than the periods of motion." It is obnoxious to the criticisms expressed as to original claim 3 in our former opinion, and for reasons therein expressed must be held void.

The decree of the Circuit Court is reversed, without costs of this appeal to either party, and the cause remanded, with instructions to enter a decree in accordance with this opinion.